IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Steven L. W.,[1] | ) | C/A No.: 1:23-1837-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Martin O'Malley,[2] | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Cameron McGowan Currie, United States District Judge, dated January 29, 2024, referring this matter for disposition. [ECF No. 18]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 16].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Martin O'Malley was confirmed by the Senate and sworn in as Commissioner of the Social Security Administration on December 20, 2023. Pursuant to Fed. R. Civ. P. 25(d), he is substituted for Kilolo Kijakazi as a party to this action.

Commissioner of Social Security ("Commissioner") denying the claim for Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the court affirms the Commissioner's decision.

I.      Relevant Background

        A.      Procedural History

On March 9, 2021, Plaintiff protectively filed an application for SSI in which he alleged his disability began on March 3, 2020. Tr. at 110, 206–14. His application was denied initially and upon reconsideration. Tr. at 122–254, 132–34. On October 27, 2022, Plaintiff had a hearing by telephone before Administrative Law Judge ("ALJ") James Martin. Tr. at 35–66 (Hr'g Tr.). The ALJ issued an unfavorable decision on November 8, 2022, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 14–34. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on May 2, 2023. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 52 years old at the time of the hearing. Tr. at 43. He successfully completed the general educational development ("GED") tests, earning a high school equivalency certificate. Tr. at 44. His past relevant work ("PRW") was as a stock clerk, a poultry worker, and a hose maker. Tr. at 59. He alleges he has been unable to work since March 3, 2021.[3] Tr. at 41.

2.    Medical History[4]

Plaintiff presented to the emergency room at Greenville Memorial Hospital on March 3, 2021, with symptoms of stroke that included left hemiplegia, slurred speech, left facial weakness, and gaze deviation to the right side. Tr. at 335. He underwent angioplasty and stenting of the critical right internal carotid artery. Tr. at 351. He was discharged in stable condition on March 8, 2021, with orders for home health, follow up in the stroke clinic, and a 90-day course of double antiplatelet therapy. Tr. at 349.

Plaintiff presented to nurse practitioner Sherrie R. Dansby ("NP Dansby"), to establish treatment on March 25, 2021. Tr. at 322. He reported balance problems, gait instability, and swallowing issues. *Id.* NP Dansby

---

[3] During the hearing, Plaintiff's counsel moved to amend the alleged onset date to March 3, 2021, the date Plaintiff had the stroke. Tr. at 41, 43.

[4] Because Plaintiff's argument centers on a non-medical issue, the undersigned has included only a brief medical summary.

recorded normal findings on physical exam, aside from elevated blood pressure. Tr. at 323.

Plaintiff followed up in the Prisma Health Neurology Clinic on June 17, 2021. Tr. at 362. Nurse practitioner Andrea Lee Fowler ("NP Fowler") noted slightly elevated blood pressure, elevated pulse, 5/5 strength on the right, 5-/5 strength on the left, slightly decreased sensation in the left upper and lower extremities, as compared to the right, and normal gait, station, and balance. Tr. at 365–66. She indicated "[n]o significant disability, despite symptoms (able to carry out all usual duties and activities)" on the Modified Rankin Scale ("MRS"). Tr. at 365. She advised Plaintiff to continue physical therapy exercises, to take 325 mg of aspirin daily, and to return in six months. Tr. at 367.

Plaintiff presented to Robin L. Moody, Ph.D. ("Dr. Moody"), for a consultative exam on August 2, 2021. Tr. at 586–91. He reported residual effects of a stroke that included difficulty walking, ambulation with a cane, speech change, difficulty finding words, left-sided weakness, poor concentration and memory, and left ear hearing loss. Tr. at 587. He endorsed sadness, difficulty sleeping, and feeling tired and weak all the time. *Id.* He denied completing chores, preparing meals, managing funds, shopping, driving, and bathing and dressing without assistance. Tr. at 588.

4

Dr. Moody observed Plaintiff to ambulate slowly with use of a cane, to have slow speech, to be delayed in response, to have some word-finding difficulty, to appear confused at times, to have impaired memory and concentration and limited insight and judgment, and to demonstrate flat affect and anxious mood. Tr. at 588–89. Plaintiff scored 17/30 points on the Mini-Mental State Exam ("MMSE"). Tr. at 589. He identified three of three items immediately, but none of the three on delayed recall. *Id.* He knew the date, day of the week, and season, but not the month or year. *Id.* He recalled the state, city, county, and floor, but not the name of the building in which the exam was conducted. *Id.* He was able to identify two objects, repeat a phrase, identify three geometric shapes, read and follow a command, and write a sentence. *Id.* Dr. Moody noted "[r]esults of this assessment appear[ed] valid." *Id.*

However, she also wrote: "Steven appeared to show effort during testing although at times it was questioned. He sometimes gave strange responses. For instance, when asked the shape of a ball he replied 'zero.' When asked how a tiger and horse are alike, he responded, 'Loud.'" *Id.* She administered the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV") and noted scores in the "Very Deficient" range on all measures. *Id.* She wrote: "Results of this administration of WAIS-IV are somewhat questionable given his sometimes strange responses." *Id.* Dr. Moody administered the

Wide Range Achievement Test, Fifth Edition ("WRAT-5"), which showed Plaintiff to be functioning on a third grade, second month level in word reading and on a kindergarten level in math computation. Tr. at 590. She also considered these results "questionable given [Plaintiff's] educational history." *Id.*

Dr. Moody noted Plaintiff was not forthcoming about his history of methamphetamine abuse. *Id.* She wrote: "It is possible he has a major vascular Neurocognitive disorder but malingering is also questioned." Tr. at 591. Her impression was that Plaintiff had a neurocognitive disorder, but not to the extent he demonstrated. *Id.* Her diagnostic impressions were rule out unspecified depressive disorder, rule out malingering, rule out major vascular neurocognitive disorder, and rule out methamphetamine use disorder. *Id.*

On August 6, 2021, state agency medical consultant Joseph Kmonicek, M.D. ("Dr. Kmonicek"), reviewed the evidence and assessed Plaintiff's physical residual functional capacity ("RFC") as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; push and/or pull (including operation of hand and/or foot controls) unlimited, except as otherwise provided for lift and/or carry; never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; and avoid concentrated exposure to

extreme cold, extreme heat, vibration, hazards, fumes, odors, dusts, gases, and poor ventilation. Tr. at 100–03. A second state agency medical consultant, Adrian Corlette, M.D., assessed the same physical RFC on October 5, 2021. Tr. at 116–18.

Plaintiff denied new stroke-like symptoms during a visit to the Cerebrovascular and Stroke Center on February 2, 2022. Tr. at 593. He continued to endorse residual left-sided weakness and numbness, changes in behavior/personality, and short-term memory difficulties. *Id.* Plaintiff's heart rate and blood pressure were elevated, and Neel Nitin Shah, M.D. ("Dr. Shah"), noted slightly increased muscle tone on the left, left upper extremity pronator drift, 4+/5 proximal strength on the left, decreased sensation to light touch on the left, slow rapidly-alternating movements on the left, normal gait and stride, absent Romberg sign, and a score of 2 on the MRS, consistent with "slight disability (unable to carry out all previous activities, but able to look after own affairs)." Tr. at 595–96. Dr. Shah explained to Plaintiff and his girlfriend that his deficits were likely to persist and serve as his new baseline. Tr. at 596. He instructed Plaintiff to continue taking aspirin and Atorvastatin and referred him to case management to assist him in finding a primary care provider closer to his home and to psychology for cognitive behavioral therapy. *Id.*

Plaintiff was hospitalized at AnMed Health from March 13, to March 18, 2022, for pyelonephritis of the right kidney, constipation, benign prostatic hyperplasia with lower urinary tract symptoms, history of stroke, hypertension, COVID-19, and bacteremia due to Gram-negative bacteria. Tr. at 786. He was initially treated with intravenous antibiotics and subsequently transitioned to oral antibiotics. Tr. at 788. His urinary symptoms were treated with Flomax. *Id.* Providers noted mild left hand and leg weakness on exam, but the findings appeared to be consistent with Plaintiff's post-stroke baseline functioning. Tr. at 779, 798, 821.

Plaintiff presented to the ER at AnMed Health following a syncopal episode on August 21, 2022. Tr. at 912. He reported the episode occurred after he donated plasma and walked anywhere from half a mile to several miles to a location where he consumed a few alcoholic beverages. Tr. at 912, 915. He demonstrated 4/5 left upper and lower extremity strength, which was consistent with is baseline functioning. Tr. at 917. He received fluids. Tr. at 919. Michael T. Clarke, M.D., assessed unspecified syncope and discharged Plaintiff to his home. Tr. at 918.

C.    The Administrative Proceedings

    1.    The Administrative Hearing[5]

        a.    Plaintiff's Testimony

Plaintiff testified he lived with his girlfriend, Janis F[] ("Ms. F."). Tr. at 43–44. He confirmed he had previously worked at Anderson Industries, where he made garden hoses. Tr. at 44. He estimated he lifted 75 pounds in that job. Tr. at 45. He stated prior to that, he had worked at House of Raeford Farms, where he picked up chickens from the floor and cleaned the floors and machines. *Id.* He estimated he lifted 80 pounds on that job. *Id.* He said he previously worked at Ingles, where he set up and stocked shelves and lifted approximately 100 pounds. *Id.*

Plaintiff testified he continued to have problems related to the stroke he sustained on March 3, 2021. Tr. at 45–46. He endorsed difficulty walking that required him to use a cane in his left hand for balance. Tr. at 46. He said he dragged his left leg. *Id.* He explained his stroke had affected his throat and left arm, leg, and eye. Tr. at 47. He stated he continued to have "no strength" in his left arm and estimated he could use it to lift only two to three pounds. *Id.* He endorsed blurry vision in his left eye. *Id.* He said he had difficulty hearing out of his left ear. *Id.* He indicated he continued to have

---

[5] The hearing transcript reflects that a prior hearing was held on June 8, 2022, but it was not recorded because the recording system failed. Tr. at 37–38.

difficulty with balance that led to falls. Tr. at 47–48. He stated he had mental problems that included frustration and difficulty remembering, conversing, verbalizing his thoughts, and focusing for prolonged periods. Tr. at 48–49.

Plaintiff testified Ms. F. assisted him with bathing and dressing. Tr. at 49. He said he had difficulty holding a washcloth and soap in his hand and could only wash one side of his body. *Id.* He endorsed low energy and said he slept for three to four hours during the day. *Id.* He estimated he could stand for two minutes and walk for two minutes at a time. Tr. at 50. He stated he spent much of the day lying down because his legs would "go to sleep" if he sat upright for too long. Tr. at 50–51. He denied cooking and performing household chores. Tr. at 51.

Plaintiff stated he had moved from his mother's home to Ms. F.'s home during the summer because his mother could not care for him. *Id.* He denied having a driver's license. *Id.* He said he had no hobbies or pets and typically watched television and movies. Tr. at 52. He indicated his family members provided funds for him and Ms. F. to pay their bills. *Id.*

b.    Witness Testimony

Ms. F. testified Plaintiff was her fiancée and they lived together. Tr. at 54. She stated she had observed Plaintiff's balance problems and indicated he had to walk with a cane at all times. *Id.* She said Plaintiff had difficulty remembering and was constantly asking her to provide the month, day, and

time. *Id.* She indicated Plaintiff's personality had changed since the stroke. Tr. at 54–55.

Ms. F. explained that Plaintiff had moved in with her because his mother had not wanted to cook, had been unable to assist him with bathing, and had grown frustrated with having to tell him what to do over and over again. Tr. at 55. She stated she had to help Plaintiff wash his body and get his clothes together. *Id.* She indicated she had worked outside the home while Plaintiff was living with his mother, but had stopped working when he moved in with her because she could not leave him. *Id.* She said Plaintiff often left the refrigerator door open, and she did not allow him to cook because she feared he would leave the stove on. Tr. at 56. She confirmed that Plaintiff's family provided them financial support. *Id.*

Ms. F. stated that prior to the stroke, Plaintiff had been happy, had joked around, had performed physical activities, had worked, and had played basketball. *Id.* She said Plaintiff was no longer talkative, did not perform physical activities, and was "not there" mentally. *Id.* She explained she had purchased hand grips for Plaintiff to work on strength on his left side, but his left hand "stay[ed] cold" and would "draw[] back." *Id.* She noted Plaintiff often choked when eating food and while sleeping. Tr. at 57.

c.    Vocational Expert Testimony

Vocational Expert ("VE") Edward Smith reviewed the record and testified at the hearing. Tr. at 58–63. The VE categorized Plaintiff's PRW as a stock clerk, *Dictionary of Occupational Titles* ("*DOT*") No. 299.367-014, requiring heavy exertion and a specific vocational preparation ("SVP") of 4, a poultry worker, *DOT* No. 411.687-010, requiring medium exertion per the *DOT* and heavy exertion as performed and an SVP of 2; and a hose maker, *DOT* No. 752.684-030, requiring medium exertion per the *DOT* and heavy exertion as performed and an SVP of 3. Tr. at 59. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift and/or carry 20 pounds occasionally and 10 pounds frequently; sit for six hours in an eight-hour workday; stand and/or walk for six hours in an eight-hour workday; push and pull as much as he could lift and carry, except that he would be limited to occasional operation of hand controls with the left hand; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; frequently be in an environment with unprotected heights, moving mechanical parts, operation of motor vehicles, extreme heat, extreme cold, vibration, dust, odors, fumes, and pulmonary irritants; sustain concentration, persistence, and pace sufficient to carry out simple instructions in two-hour increments with no specific production rate, such as assembly line work, or work that requires

hourly quotas; and could make simple work-related decisions. Tr. at 60–61. The VE testified that the hypothetical individual would be able to perform light work with an SVP of 2 as a textile checker, *DOT* No. 221.587-010, an office helper, *DOT* No. 239.567-010, and a collator operator, *DOT* No. 208.657-010, with 41,000, 141,000, and in excess of 300,000 positions in the national economy, respectively. Tr. at 61.

The ALJ asked the VE if his identification of those jobs in response to the hypothetical question was consistent with the *DOT*. Tr. at 62. The VE stated it was. *Id.*

The ALJ asked the VE to consider that the individual would be off-task for 15% of time in an eight-hour workday. *Id.* He asked if the individual would be able to perform the jobs the VE previously identified. *Id.* The VE testified the individual would be unemployable. *Id.* The ALJ asked the VE if his testimony as to this matter was consistent with the *DOT*. *Id.* The VE stated the issue of time off-task was not addressed in the *DOT* and his response was gleaned from his experience in training. *Id.*

The ALJ specifically asked the VE to review the jobs he identified in response to the hypothetical question, compare the limitations in the hypothetical questions to the *DOT* requirements for each job, and advise him of any conflicts. Tr. at 62–63. The VE stated there were no conflicts. *Id.*

Plaintiff's counsel asked the VE to indicate employers' tolerance for off-task behavior. Tr. at 63. The VE testified that, in his experience, an individual off-task in excess of 10% of the time would ultimately be unemployable. *Id.*

Plaintiff's counsel asked the VE to reconsider the first hypothetical question and to further assume the individual would require a cane for standing and walking activities. *Id.* He asked if the limitation would affect the jobs the VE previously identified. *Id.* The VE stated the jobs would be precluded. *Id.* He asked the VE if the addition for use of a cane would reduce work to the sedentary exertional level. *Id.* The VE testified it would "[b]y and large." *Id.*

Plaintiff's counsel asked the VE to consider that the hypothetical individual would be unable to maintain concentration, persistence, or pace for a two-hour block of time. *Id.* He asked if there would be jobs. *Id.* The VE testified there would not. *Id.*

### 2.    The ALJ's Findings

In his decision dated November 8, 2022, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since March 9, 2021, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: right MCA stroke with residual deficits of mild left hemiparesis and

decreased sensation and neurocognitive disorder (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 416.967(b), such that he is limited to lifting and/or carrying 20 pounds occasionally, 10 pounds frequently, sitting for 6 hours of an 8-hour day; standing and/or walking for 6 hours each in an 8-hour day; pushing and pulling as much as he can lift and/or carry except he is limited to occasional operation of hand controls with the left hand; can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl. He can frequently be in an environment with unprotected heights, moving mechanical parts, and where he operates a motor vehicle. He can frequently be in an environment with dust, odors, fumes, and pulmonary irritants, extreme cold, extreme heat, and vibration. He can sustain concentration, persistence, and pace sufficient to carry out simple instructions in two-hour increments with no specific production rate such as assembly line work or work that requires hourly quotas and is able to perform simple, work-related decisions.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on May 8, 1970 and was 50 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education (20 CFR 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

10.   The claimant has not been under a disability, as defined in the Social Security Act, since March 9, 2021, the date the application was filed (20 CFR 416.920(g)).

Tr. at 19–30.

II.   Discussion

Plaintiff alleges the Commissioner's step five finding is not supported because the ALJ did not comply with the requirements of SSR 00-4p.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v.*

16

*Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[6] (4) whether such impairment prevents claimant from performing PRW;[7] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find

---

[6] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[7] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 416.920(h).

claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331

F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

The ALJ included in a hypothetical question to the VE, among other limitations, a provision for the individual to push and pull as much as he could lift and carry, except that he would be limited to occasional operation of hand controls with the left hand. Tr. at 60. The VE testified the hypothetical individual would be capable of performing work as a textile checker, an office helper, and a collator operator. Tr. at 61. The ALJ specifically questioned the VE as to conflicts between his testimony and the *DOT* and received assurance that there were none. Tr. at 62. The ALJ found, among other limitations, Plaintiff had the RFC for "pushing and pulling as much as he can lift and/or carry except he is limited to occasional operation of hand controls with the left hand." Tr. at 21. He relied on the VE's testimony to meet the Commissioner's burden at step five, finding Plaintiff could perform work as a textile checker, an office helper, and a collator operator. Tr. at 29.

Plaintiff argues the ALJ failed to comply with the requirements of SSR 00-4p, rendering his step five finding unsupported. [ECF No. 8 at 6–9]. He maintains the three jobs the VE identified as allowing for occasional

operation of hand controls with the left hand are described by the *DOT* as requiring frequent handling and fingering. *Id.* at 8–9. He asserts the case must be remanded to allow the ALJ the opportunity to explain his resolution of this apparent conflict. *Id.* at 9.

The Commissioner argues there is no conflict between the VE's testimony and the *DOT* and *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* ("*SCO*") because handling and fingering are manipulative limitations, whereas operation of hand controls is an exertional function. [ECF No. 10 at 1, 7–8]. He asserts Plaintiff has cited no authority establishing that a limitation to occasionally operating hand controls with the left hand conflicts with a requirement for frequent handling and fingering. *Id.* at 6. He maintains the *DOT's* descriptions of the jobs the VE identified are silent as to operation of hand controls. *Id.* at 7. He further notes SSRs 83-10 and 85-15 confirm that operation of hand controls is an exertional function, not a manipulative function. *Id.* at 8. He states Plaintiff has cited no evidence to support a finding that he has manipulative limitations. *Id.* at 9.

In his reply brief, Plaintiff points to language describing handling in SSR 85-15 and the *SCO*. [ECF No. 12 at 1–2]. He urges this court to follow the holding in *Waters v. Saul*, C/A No. 4:18-453-FL, 2019 WL 4218419 (E.D.N.C. Aug. 19, 2019), *report and recommendation adopted by* 2019 WL

4308999 (Sept. 11, 2019), where the court found an apparent conflict between a limitation to occasional operation of hand controls and occupations requiring frequent handling and fingering.

ALJs are required to "[i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs or [vocational specialists ("VSs"] and information in the *Dictionary of Occupational Titles* (*DOT*), including its companion publication, the *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* (*SCO*) . . . and [e]xplain in the determination or decision how any conflict that has been identified was resolved." SSR 00-4p, 2000 WL 1898704, at *1. "This means that the ALJ must recognize and resolve ways in which a VE's testimony 'seems to, but does not necessarily,' conflict with the 'express language' of the *DOT*—even if the conflict is not obvious." *Thomas v. Berryhill*, 916 F.3d 307, 313 (quoting *Pearson v. Colvin*, 810 F.3d 204, 209 (4th Cir. 2015)); *see also Lawrence v. Saul*, 941 F.3d 140, 143 (4th Cir. 2019) (explaining the court is to compare the *DOT's* "express language" with the VE's testimony to assess whether an apparent conflict exists).

"The term 'exertional' has the same meaning in the regulations as it has in the U.S. Department of Labor's classifications of occupations by strength levels." SSR 85-15, 1985 WL 56857, at *2. "[E]xertional capabilities" are "those required to perform the primary strength activities," which include

sitting, standing, walking, lifting, carrying, pushing, and pulling. SSR 83-10, 1983 WL 31251, at *2, *5. "Any job requirement which is not exertional is considered to be nonexertional. A nonexertional impairment is one which is medically determinable and causes a nonexertional limitation of function or an environmental restriction." SSR 85-15, 1985 WL 56857, at *2. "Nonexertional limitations can affect the abilities . . . to seize, hold, grasp, or turn an object (handle)" and to use . . . the fingers to pick, pinch, etc." *Id.*

Appendix C to the SCO addresses the physical demands of occupations. *SCO*, App'x C, 1993 Ed., U.S. Department of Labor, Employment and Training Administration. It states: "The Physical Demands of an occupation are described in relationship to twenty different factors." *Id.* The first factor addressed is strength. *Id.* "To determine Strength Level, analysts review three elements in the physical demands of a job and condense these three elements into a single rating reported as the overall Strength Level of the occupation." *Id.* Those three elements include body position, weight/force, and "Controls: Hand-Arm and Foot-Leg." *Id.* The SCO explains: "Controls entail use of one or both arms or hands (hand-arm) or one or both feet or legs (foot-leg) to move controls on machinery or equipment. Controls include, but are not limited to, buttons, knobs, pedals, levers, and cranks." *Id.* Given this explanation, it appears that operation of hand controls falls under

"[c]ontrols"—one of the three elements that factor into determining the overall strength level.

Unlike strength, the other 19 physical demand factors are rated in terms of frequency as "not present," "occasionally," "frequently," and "constantly." *Id.* Handling[8] and fingering[9] are among the other 19 physical demand factors. *Id.* Accordingly, they are rated in terms of frequency of occurrence, but, because operation of hand controls is considered as part of the strength analysis, it is not rated in the *DOT* based on frequency of occurrence. This means the *DOT's* job descriptions are silent as to the frequency with which operation of hand controls is required.

The Fourth Circuit has not considered whether an ALJ must address an apparent conflict when a VE testifies as to a matter on which the *DOT* is silent. *See Singleton v. Saul*, C/A No. 1:18-3549-JMC-SVH, 2020 WL 6292452, at *20 (D.S.C. Mar. 13, 2020), *report and recommendation adopted by* 2020 WL 5494525 (Sept. 10, 2020). However, this court has previously declined to find an apparent conflict in such cases. *See id.* (declining to find

---

[8] Handling includes "[s]eizing, holding, grasping, turning, or otherwise working with hand or hands" with "[f]ingers . . . involved only to the extent that they are an extension of the hand, such as to turn a switch or shift automobile gears." *SCO*, 1993 Ed., U.S. Department of Labor, Employment and Training Administration.

[9] Fingering is described as "[p]icking, pinching, or otherwise working primarily with fingers rather than with the whole hand or arm as in handling." *SCO*, 1993 Ed., U.S. Department of Labor, Employment and Training Administration.

an apparent conflict in VE's identification of jobs as allowing for use of an assistive device where *DOT's* job descriptions were silent as to the use of such a device and did not appear to create a conflict); *Duren v. Colvin*, C/A No. 6:13-3142-RBH, 2015 WL 1268, at *19 (D.S.C. Mar. 19, 2015) (holding that VE's testimony was not in apparent conflict with the *DOT,* as the *DOT* did not address sit/stand options, and thus ALJ did not err in failing to inquire into such) (citing *Zblewski v. Astrue*, 302 F. App'x 488, 494 (7th Cir. 2008)); *Wait v. Colvin*, C/A No. 1:13-1363-TMC, 2014 WL 2979797, at *4 (D.S.C. Jun. 27, 2014) (finding "there is no conflict between VE testimony and the *DOT* where the *DOT* is silent as to the sit/stand option").

The ALJ indicated he considered SSR 00-4p and determined the VE's testimony was consistent with the *DOT*. Tr. at 29. He further stated that he relied on the VE's training, education, and professional experience regarding issues of job performance not addressed in the *DOT*. *Id.* He explained: "The VE testimony is not necessarily in conflict with the *Dictionary of Occupational Titles*, but merely supplements the *DOT* with his professional experience where the *DOT* companion publications remain silent on the issue." Tr. at 29–30.

Only a few courts have considered whether operation of hand controls equates to handling and fingering. Plaintiff cites *Waters*, which appears to be the only case in the Fourth Circuit to directly address the issue. In *Waters*,

25

2019 WL 4318419 at *6, the court held the ALJ erred in failing to resolve an apparent conflict where the ALJ included restrictions in the hypothetical question for occasional operation of hand controls and frequent handling and fingering and the VE identified jobs the *DOT* described as requiring frequent handling and fingering. *Id.* The court noted the *DOT* "d[id] not expressly limit any of [the jobs] to occasional or less frequent hand controls." *Id.* It further found "[t]he definition of 'handling' as used in the *DOT* expressly encompasses the use of hand-operated equipment" and "[t]he definition of 'fingering' is in accord." *Id.* However, the court's explanation ignores that the *DOT* does not specify frequency of use with respect to strength demands, that hand-arm controls fall under strength, and that handling and fingering are considered as separate functions—apart from strength—that must be characterized in terms of frequency of occurrence. *SCO*, App'x C, 1993 Ed., U.S. Department of Labor, Employment and Training Administration. The court also failed to address that operation of hand controls is considered in determining a claimant's exertional limitations, whereas fingering and feeling are manipulative limitations considered in assessing a claimant's nonexertional limitations. *See* SSR 83-10, 1983 WL 31251, at *2, *5; SSR 85-15, 1985 WL 56857, at *2.

The Commissioner references several cases that decline to equate operation of hand controls with handling and fingering. *See* ECF No. 10 at 6,

8–9 (citing *Lett v. Saul*, C/A No. 18-164-B, 2019 WL 13218820, at *10 (S.D. Ala. Sept. 20, 2019) (noting the plaintiff had cited no authority to support his "conflat[ion of] the operation of hand controls with handling and fingering," that the *DOT* was silent as to the frequency of operation of hand controls, and that "courts ha[d] uniformly held that the fact that the *DOT* does not address a particular requirement or limitation does not suggest the existence of a conflict between the *DOT* and the VE's testimony"); *Kelly P. v. Kijakazi*, C/A No. 2:20-14535, 2023 WL 5321033, at *16–17 (D.N.J. Aug. 18, 2023) (finding no conflict between the RFC limitations and the *DOT* and explaining that the applicable regulations distinguish exertional limitations related to strength demands, such as pushing and pulling, from nonexertional limitations that include manipulative functions such as handling and that the *SCO* distinguishes hand controls as relating to strength or exertional abilities from manipulative functions such as handling and fingering); *Orlando P. v. Comm'r of Soc. Sec.*, C/A No. 21-20186, 2022 WL 17820348, at *8 (D.N.J. Dec. 20, 2022) (finding operation of hand controls to be an exertional, as opposed to a manipulative, limitation and that the VE's response to the hypothetical question did not conflict with the *DOT*). These cases offer more compelling rationale than *Waters*.

It is also instructive to look to the description of the tasks performed in each job, in addition to its physical demand factors. In *Michael L. v. Kijakazi*,

C/A No. 2:20-8310-SP, 2022 WL 911583, at *6 (C.D. Cal. Mar. 29, 2022, the

court explained:

> Hand controls are a set of controls in a machine that allow a
> person to operate it with their hands such as handles or levers in
> a vehicle that allow a person to operate the gas and brake pedals.
> Plaintiff does not contend, nor do the *DOT* descriptions state,
> that the jobs . . . require the operation of hand controls.

*Id.*     (citing     https://www.collinsdictionary.com/us/dictionary/english/hand-

controls and https://nmeda.org/hand-controls). The same is true in this case.

The *DOT* provides the following description for the occupation of "checker":

> Reads tickets attached to bundles of cut or wrapped towels to
> determine worker identity and weight and style of towels. Counts
> bundles of wrapped towels or estimates quantity of cut towels in
> bundle, using conversion chart based on weight and style, and
> records on production sheet quantity of bundles wrapped or
> towels cut by each worker for use in payroll computation. May
> load bundles on handtruck and move to next production area.

221.587-010, CHECKER. *DOT* (4th Ed., Rev. 1991). 1991 WL 672051. It

describes the occupation of office helper as follows:

> Performs any combination of following duties in business office of
> commercial or industrial establishment: Furnishes workers with
> clerical supplies. Opens, sorts, and distributes incoming mail,
> and collects, seals, and stamps outgoing mail. Delivers oral or
> written messages. Collects and distributes paperwork, such as
> records or timecards, from one department to another. Marks,
> tabulates, and files articles and records. May use office
> equipment, such as envelope-sealing machine, letter opener,
> record shaver, stamping machine, and transcribing machine. May
> deliver items to other business establishments [DELIVERER,
> OUTSIDE (clerical) 230.663-010]. May specialize in delivering
> mail, messages, documents, and packages between departments
> of establishment and be designated Messenger, Office (clerical).

May deliver stock certificates and bonds within and between stock brokerage offices and be designated Runner (financial).

239.567-010, OFFICE HELPER. *DOT* (4th Ed., Rev. 1991). 1991 WL 672232.

It states the following as to collator operator:

Tends machine that assembles pages of printed material in numerical sequence: Adjusts control that regulates stroke of paper pusher, according to size of paper. Places pages to be assembled in holding trays. Starts machine. Removes assembled pages from machine.

208.685-010, COLLATOR OPERATOR. *DOT* (4th Ed., Rev. 1991). 1991 WL 671753. Although the description of collator operator refences adjusting a control, it does not appear to be a hand control as defined above. In addition, there is no suggestion that both hands are required to make the adjustment or that the adjustments would have to be made on more than an occasional basis.

However, even if the description of collator operator had created an apparent conflict, the Commissioner's step five finding would continue to enjoy the support of substantial evidence. "Work exists in the national economy where there is a significant number of jobs (in *one* or more occupations) having requirements which [the claimant] is able to meet with [his] physical or mental abilities and vocational qualifications." 20 C.F.R. § 416.966(b) (emphasis added). Therefore, because the jobs of checker and office helper create no apparent conflict, if the ALJ had erred in failing to resolve an apparent conflict between the *DOT's* description and the VE's

identification of the job of collator operator, his error would be harmless. *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (noting an error is considered to be harmless where the ALJ conducted the proper analysis, cited substantial evidence to support his finding, and "would have reached the same conclusion notwithstanding his initial error").

It is also helpful to review any other evidence in the record that addresses use of hand controls and manipulative functions. In *Froehlich v. Commissioner of Social Security*, C/A No. 17-1179-M, 2018 WL 3354998, at *5 (W.D. Okla. June 12, 2018), the court rejected the argument that operation of hand controls was equivalent to reaching and handling, explaining: "Notably, forms completed by state agency physicians and similar forms typically provided to examining physicians clearly indicate that manipulative activities such as reaching and handling are distinct from the ability to push, pull, and operate hand and foot controls."

Here, a review of Dr. Kmonicek's RFC assessment, which the ALJ considered persuasive, supports a conclusion that operation of hand controls is a function separate from handling and fingering. Dr. Kmonicek found "push and/or pull (including operation of hand and/or foot controls) unlimited, except as otherwise provided for lift and/or carry," Tr. at 101, but he separately indicated Plaintiff did not have manipulative limitations, Tr. at 102.

In light of the foregoing, the undersigned finds no apparent conflict between the provision in the RFC assessment for occasional operation of hand controls with the left hand and the *DOT's* descriptions of the jobs the VE identified and the ALJ relied on as requiring frequent handling and fingering. The ALJ complied with the requirements of SSR 00-4p, and his step five finding is supported by substantial evidence.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether his decision is supported as a matter of fact and law. Based on the foregoing, the undersigned affirms the Commissioner's decision.

IT IS SO ORDERED.

February 8, 2024                         Shiva V. Hodges
Columbia, South Carolina              United States Magistrate Judge